We're not in Richmond, obviously, but we appreciate y'all working with us to conduct these oral arguments remotely. I hope everyone survived the bad weather and is handling that okay. We got two cases today and we'll proceed with our first case, 24-2050. We'll hear from Mr. Culp first. Brian Culp Thank you, Your Honor. May it please the court. Brian Culp of Deckard LLP and I'm here representing Ms. Carissa Thompson pro bono along with my co-counsel from the National Veterans Legal Services Program. Ms. Thompson served honorably in the U.S. Air Force until her career was cut short by a debilitating spine injury. The resulting disability entitled Ms. Thompson to the benefits and privileges of a military retiree. But the military's disability evaluation system unfortunately failed Ms. Thompson, just as it failed many of our nation's veterans returning from the wars in Iraq and Afghanistan. In response to this well-documented disability crisis, Congress passed the Dignified Treatment of Wounded Warriors Act. Among other reforms, the act established the Physical Disability Board of Review to reexamine cases like Ms. Thompson's of veterans who received disability ratings below the 30% threshold necessary for military retirement. The law was designed to eliminate discrepancies between ratings assigned by the military and the Department of Veterans Affairs. And to that end, Congress required the PDBR to strictly follow the schedule for rating disabilities used by the VA, also known as the VASRD. Applying the VASRD here should have been straightforward. Section 4.71a requires a 40% disability rating for injuries that limit forward flexion of the spine to 30 degrees or less. The schedule therefore ties the veteran's disability rating solely to her range of motion limitation, and the record contains five VASRD-compliant exams where such a limitation was undisputedly found. Nevertheless, the PDBR discounted, ignored, or failed to explain away these exams in favor of three others that did not comply with the VASRD. That was both arbitrary and capricious and contrary to law, and the district court's decision to uphold the PDBR's unlawful action should be reversed for three independent reasons. First, the PDBR arbitrarily disregarded five VASRD-compliant exams. Those include, most notably, the August 2005 VA exam, taken just two months after Ms. Thompson's separation, and the December 2004 exam, taken just a few months before. Second, the PDBR could not lawfully rely on any of the three exams that did. Each of those three exams was legally inadequate for evaluation purposes under the VASRD as a matter of law. And third, the PDBR failed to follow the VASRD's requirement that any doubt regarding the degree of disability must be resolved in favor of the claimant. So turning to the first error, all agree that the law required the board to take a snapshot of Ms. Thompson's condition at the time of her separation in May 2005, and the two exams that framed that snapshot on either side with range of motion measurements, those in December 2004 and August 2005, both showed flexion of 30 degrees or less. Both exams thus validated Ms. Thompson's disability claim, but the board disregarded them. That was error several times over. Take the December 2004 exam first, which set JA231 and which observed only 20 degrees of flexion. By itself, this exam fatally compromises the board's decision because the board had no response to it, let alone a rational one. I urge the court to read the entirety of the board's short opinion with this exam in mind, and you will see that there's nothing in the opinion that provides a basis for discounting that exam, nothing at all. The board's failure to grapple with this highly probative evidence is a prime example of arbitrary and capricious action. Now, the district court tried to fill the analytical void here, submitting that the February 2005 exam rectified the December exam's limited range of motion finding, but that argument is a non-starter. For one thing, that's not what the board said. The board simply avoided any analysis whatsoever of the December 2004 exam, and courts may uphold agency action only on the grounds offered by the agency. For another thing, the district court's post hoc rationalization is itself contrary to law. The vassity provides disability ratings for spinal motion, and the February 2005 exam did not record range of motion at all. It thus could not have possibly, as a matter of law, rectified the December exam findings. It in no way spoke to the relevant issue. The board's treatment of… Could I interrupt you? Just trying to, I guess, understand maybe how we look at this. I certainly understand your arguments about how the December and August exams and the results of them, you think, support your client's claim. What do we do, though, if we have conflicting reports? Some that say 30 or more, some that say limited or no range of motion impairment. Is the board, the PDBR, entitled to look at the conflicting reports and say which one it feels are most persuasive? The first thing I'll say, Your Honor, is that we're looking at a snapshot in time here of the which is May 2005. Again, the two closest on either side with range of motion measurements both show 30 degrees flexion or less. The board didn't grapple with one. As I'll explain later, its rationale for the August 2005 exam for throwing that away was arbitrary, capricious, and contrary to law. Go ahead. Finish your answer. I just want to make… The second point I want to make is that our position is that the reliance on the other three exams, those were legally inadequate and therefore the board could not rely upon those exams as a matter of law. Without those exams, the board's decision didn't have a leg to stand on. So, if I understand then, if you have conflicting medical evidence, and assume the conflicting evidence is not legally infirm, that the board can select which or rely on evidence over conflicting evidence, that's got to be right, correct? To an extent, Your Honor. So, Section 4.3 of the Bass Review still requires finding a 40% rating if there's any reasonable doubt on that score, between 10% and 40%. Subject to the reasonable doubt, regulatory requirement or statutory, I can't remember if that's statute or reg. It's a regulation, but Congress said in Section 1216AA that the PDBR has to follow the Bass Review and the CAVC or Court of Appeal for Veteran Claims Decisions that interpret the Bass Review. Can I ask you a question about that? Sure. It looks like the board is supposed to be applying the standards that were in place at the time of the rating decision, right? At the time of the separation. That's what the DOD instruction says, yes. Right. That's what I thought. So, that would seem to apply to the Court of Veterans Claims Decisions, right? If those are binding interpretations of the law, shouldn't the board only be bound by Court of Veterans Claims Decisions that existed at the time of your client's rating decision? So, DeLuca did exist at the time, so the board would unquestionably be bound by that decision. I'm just asking if that's correct. And then I think Congress has told us that we want to look to the Court of Appeals for Veterans Claims, and that's a point of consistency. And when statutes are read, it's presumed that the statutes are going to be read at the time that the reader looks at the statute, so even in the future. So, Congress didn't say Court of Appeals for Veterans Claims Decisions as of this date, and so we submit that as the Court of Appeals for Veterans Claims interprets these standards. That's what Congress told the board to follow. All right. So, just to help me understand your answer, is your answer that, no, we should be applying the law as decided later by the Court of Veterans Claims, or yes, we should only be looking at the law as it existed at the time this original decision was made? So, to the extent the regulations change, the board's or the DOD's instruction says to look at those in effect at the time, and none of those have changed here. Those have all been consistent since the Act was passed, so it makes no difference here. To the extent there are additional decisions of the CAVC, we submit that those are still binding under the plain language of 1216AA. So, apply the regs as they existed at the time, but apply case law that came later? For the regs that were in place at the time, yes. And that comes from where? Those are also interpreting the original meaning of what those regulations would say, so it's not as if the law is changing. They're just saying what it means, and the board is bound by those decisions. Okay. I just wanted to get your position on that. Thank you. Okay. So, I want to go to the August 2005 exam here, and we think the board's treatment of that exam was fatally flawed. So, the board was obligated to give this VA exam particular consideration under DOD instruction of 6040.44. So, the exam, which is at JA 116-18, could not be cast aside lightly, but the board found the exam measurement not useful and disregarded it merely because Ms. Thompson was wearing a back brace. That was legal error for multiple reasons. First, the exam's range of motion limitation was based on Ms. Thompson's pain tolerance, not the back brace. The report itself makes clear that her motion limitation was, quote, secondary to pain, which means due to pain, yet the board simply ignored this evidence too, and so did the appellees before this court. They never grappled with it anywhere in their brief, and that's failure is telling. Second, section 4.10 requires assessment of a disability under the ordinary conditions of daily life. Nobody disputes that a brace can be such an ordinary condition, and so it was here. Ms. Thompson wore the back brace, quote, every day. That's at JA 117. What this means is that the VA, unsurprisingly, did precisely what its schedule required when conducting the exam and issuing a 40% disability rating. Congress said to follow that schedule too, but the PDPR defied the law and disregarded the facts to generate an artificially low rating, and this would say nothing of the fact. Counsel, if I could, I mean, you're using the word disregarded, and I mean, you know, it looks to me like the board spends a good bit of time with the August VA rating, now, and they do say, as you point out, that it was not as helpful to them because of the back brace and its perception that that affected the range of motion measurements there. I guess what, you know, my question really is, I mean, you're saying disregarded. Why isn't it just that it looked at that, and based on the information that it gleaned from that report, it found it less persuasive? I mean, it can't be that if, I mean, it doesn't seem like it's fair to say if you, if they didn't find it as persuasive as other evidence, that's disregarding it. That's just weighing the persuasiveness, isn't it? So the first point is that it's contrary to law. It was entirely appropriate for the examiner to examine Ms. Thompson while she had the back brace on because that's an ordinary condition of her daily life and what she would be doing when seeking employment. So that's a legal error. The disregarding the facts point is that, to the extent the board thought— But just, I mean, let me just, I mean, if I have an ankle brace on, if I've sprained my ankle, I know this is way more serious, so please don't take this as disrespectful of your client's condition because I'm not trying to do that at all. But if I'm wearing an ankle brace to protect an ankle injury, its whole purpose is to prevent me from having the movement that I would have if I wasn't using it. I mean, that, I mean, it just doesn't seem, you know, arbitrary or capricious to me to say we're going to take that into account. Tell me what, am I missing something there? Well, so the question is what caused her limitation of range of motion? And I think it's clear from the record that it was pain, from the secondary to pain quote that I mentioned. And unable to refute this, I'll note that the appellees at page 30 of their brief say that the PDBR did not conclude that the back brace caused her limited range of motion. So that is no surprise given, again, that such a causal relationship is flatly inconsistent with the evidence of record. But if that's the case, if appellees are right that the brace did not limit range of motion, then there was no reason for discounting the exam at all. So simply put, we think the board's flawed treatment of these December 2004 and August 2005 exams alone requires reversal. But the board, again, could not lawfully rely upon any of the other three exams that it did for assessing Ms. Thompson's disability. Again, the VASRD requires rating spinal injuries based on range of motion. So exams that lack such measurements cannot be relied upon for a lawful rating, as Correa holds. You're about out of time, and I just want to make sure I'm, that's okay. I want to make sure you're on, it sounds like you're, the point you're making there is that if a report doesn't contain range of motions measurements, it's not properly relied upon? That's correct, your honor. Okay, and you can flesh that out more on rebuttal. Any other questions, Judge Rushing or Judge Benjamin, at this point? Thank you, counsel. We'll hear from you again in just a little bit. So thank you. Ms. Koch, am I pronouncing that right? Good morning, your honor. Okay, Koch, I'm sorry. My name's Quattlebaum, and it gets butchered so much I'm probably not sensitive enough, so, but we'll hear from you now. May it please the court, Rebecca Koch on behalf of Apple East. As recognized by the district court, the PDBR analyzed Ms. Thompson's medical examination records, addressed any shortcomings found in the records, carefully evaluated the VA's disability rating, and provided a reasoned basis grounded in the record and Vassar D for its decision to leave Ms. Thompson's disability rating unchanged. The district court's decision should be affirmed. Ms. Thompson wants this court to reweigh the evidence and substitute its judgment for that of the PDBR, but that is not permitted by the standard of review. In APA cases, this court applies a narrow and deferential standard when assessing whether the challenge agency action is supported by the record. This court has made clear- Let me ask you, let me ask you about that, because in looking at the record and looking at the medical records, help me understand, walk me through the board's decision that functionally gave no weight to the December of 2005, 2004 range of motion measurement, but gave weight to the February of 2000, I'm trying to make sure I get the date straight, February 2005 exam. So it seems a little odd to me that you have a December rating where you get, the doctor actually gives you the range of motion, and then in February, there's no range of motion, very little in that, but the board relies on the February of 2005 report over the 2004. I'm just trying to understand the rationale there and why that's not arbitrary and capricious. Of course, Your Honor, and I think it's important to note that the PDBR, and as pointed out by the district court, the PDBR discussed at length the December 13, 2004 exam. The range of motion variance recorded in that examination was rectified by the February 1, 2005 examination. Although the December 2004 examination showed a lower range of motion, Thompson's February 2005 examination showed an improved condition, which logically supports the PDBR's conclusion that higher disability rating was not warranted. So what the board saw is the board saw a full range of motion by June of 2004. There is that blip in December of 2004, and it discussed that exam report at length in its analysis. But I don't know if I would agree with that, because it appears, if you look at the doctor's notes, it appears that in December of 2004, February in 2005, and then August of 2005, there seems to be this common thread of this, reasonably, the worsening of her conditions. It seems that the doctors are commenting that the condition is worsening. Well, that's not the assessment of the PDBR. The PDBR concluded that its ultimate conclusion was that Ms. Thompson was able to ambulate normally with or without the back brace with aggravation of pain by activity. It saw and it made clear that it noted that it's a full range of motion by the summer of 2004. And it saw further information supportive of that conclusion in the February of 05 examination report. What the courts indicated is, so the PDBR noticed that the February 05 and noted the omission of range of motion measurement. But then it said that it supported the observations of full range of motion previously found during the June 11, 2004 exam, because the report, and now I'm quoting, documented thorough muscle strength evaluation, including of the iliopsoas muscle, a hip flexor that has its origins from the upper lumbar spine, with normal strength of all muscles noted, and no particular difficulty with pain or muscle spasm during strength testing. All right, well now look at JA 242. And I think it's line 232. It appears there that it says it's worsening, right? With activity. 242. My JA 242? Mm-hmm. Look at 232. Oh, 232. I'm so sorry. From the February... No, I gave you the wrong date. I mean the wrong site. 232, where it says it, which is a February report, it says that it's worsening with activity. She continues to have... Yes, and I'm sorry for looking at the wrong page, Your Honor. Yes, she continues to have pain that is worse with activity. But what the PDBR concluded was that that positive strength testing, including of the iliopsoas muscle, that hip flexor that has its origins in the upper lumbar spine, the PDBR's conclusion was that that was consistent with the full range of motion that it saw in June of 2004. So you think that five out of five motor rating equates to a range of motion measurement? I'm not saying that that five out of five motor strength testing equates to a range of motion measurement. The PDBR recognized that the February 05 examination lacked a range of motion measurement. But what it said is that that strength testing supported its conclusion of full range of motion. And if we look at JA 55, it's the exact language. The board interpreted this description. This description refers to the MEV NARSIM. And I'm going back to, the board interpreted this description of the CI's range of motion as reflecting TL range of motion within functional limits. This contention is supported by the second orthopedic opinion in February of 2005. No range of motion of the TL spine was documented at that visit, but the examiner documented thorough muscle strength evaluation. Again, that goes into the language that I've been repeating. So that was the board's conclusion. And again, we have to keep in mind- So counsel, can I follow up on Judge Benjamin's question and maybe a point that was made by your colleague earlier? I guess really more to that. Your colleague says it's as a matter of law, impermissible for the board to have relied on that February report because it did not contain range of motion measurements. Not that it's just more persuasive or less persuasive, but according to him, that's legally impermissible to be considered. What's your position on that? My position is that there was still useful information in that February 2005 exam report that the board could look at and consider in its analysis. And if you look at section 4.2 of the VASRD, it indicates the PDBR has to consider the evidence and interpret reports of examination in light of the whole recorded history. The PDBR looks at all the exam reports. Well, how do you... So what's your explanation for not considering the December of 2004 report? If we're looking at all the reports and so there's a December report and then there's a February report, why are we not considering the December report? It seems as if there's cherry picking of which reports the board looked at. Well, it was considered. I mean, as found by the district court, it's discussed. The PDBR discussed that December report. It discussed the range of motion finding in that examination. However, the board saw a strong muscle during testing in February 2005 and its conclusion is that that reinforced its prior conclusion that she had full range of motion and that that was her condition as of June of 2004. And that February 2005, it saw further evidence that would be consistent with its conclusion that she had full range of motion. So does that bring up... That brings up, it seems like a point. I mean, I think you're correct that the board spends a good bit of time discussing that December information, that December report. But when it gets into the evaluation part of things, as opposed to just reciting the history, it doesn't bring it up again, which I think brings up a question, a legal question of is... Well, first of all, is... This is a two-part question. Number one, there does seem to be a requirement to compare or look at the VA's decisions. And I didn't... I may have missed it, but the question number one is did the VA specifically discuss that December report? In the VA, in the C&P exam? Yes, yes. Do you recall? I don't recall off the top of my head, your honor. I apologize. That's all right. In my looking at it, I didn't see extensive treatment there. So to the extent the need to look... comes from the obligation to compare with the VA thing. I didn't... It may have been there, so I don't want to be wrong there, but I didn't see at least extensive discussion of it. And I guess that's my next question, which is, is there a law that says that if the board doesn't address every piece of evidence that it's arbitrary and capricious? No, your honor. And there's case law to say that the agency doesn't have to address every shred of evidence. And I would step back and say the... I'm sorry, excuse me, the PDBR. When I said agency, I meant PDBR. The PDBR does not need to address every shred of evidence. What is significant is, was its decision reasoned? Can its decision making be reasonably discerned? And that's the Supreme Court case, Bowman Transportation v. Arkansas Best Freight. The decision can be upheld as long as the agency's path may be reasonably discerned. And again, in this court, American Whitewater v. Tidwell, so long as the agency provides an explanation of its decision that includes a rational connection between the facts found and the choice made, its decision should be sustained. Here, the PDBR, it's not that it overlooked the December exam. It's in its recitation of her examination history. And it can be inferred from its analysis that it believed the February 2005 exam rectified that range of motion finding in 2005. Can I ask about, in the analysis portion, the board seems to... It focuses on what it finds most persuasive. And then it also fulfills its obligation to explicitly compare the evaluation here to the VA's evaluation. In discussing what the board finds most persuasive, they say they placed greater probative value on the orthopedic exams in June and in February. And throughout their description, they emphasize that in June, it was an evaluation by an orthopedic surgeon. July, it was the same orthopedic specialist. February, a second orthopedic opinion. That, to me, seemed to suggest that they were finding the examinations and reports by orthopedics specialists most persuasive. And it seemed that the December evaluation at the pain clinic by, I think, an anesthesiologist is not... They didn't mention that they found that one particularly relevant. Now, they don't describe why or why not. But to me, that seemed to be important to the board, that they pointed out who was conducting these exams. They don't say that. But am I correct in understanding the December evaluation was not conducted by an orthopedic specialist or an orthopedic surgeon? It wasn't another orthopedic opinion? Yeah, that's correct, Your Honor. So the board... I'm sorry. Go ahead. I'm sorry. No, go ahead. But I would say what is relevant is the range of motion measurement. So in Section 4.71A, you're looking at range of motion, right? And whether that measurement was by an anesthesiologist or an orthopedist, that's the critical information. And what you have here and what the district court found was that that December 2004 measurement was rectified by the February 2005 exam, and that exam supported the board's earlier conclusion that she had full range of motion. But we don't... The district... You talked about the standard review, how we don't reweigh evidence, and that's right. But we don't... We review this de novo, correctly. So the fact that the district court said it, we don't look for evidence that supports that or not. The district court's opinion, we can look at and observe, but it's not entitled to any deference as I understand our review standard. Yes, Your Honor. Let me ask you this regarding the August of 2005. And I know in the brief, you all argued that this point about the back brace and... But there is... The regulation says that you're supposed to look at the, I guess, the medical report closest in proximity to the data separation. So to me, it seems as if even if I accept your argument regarding the February of 2005, help me understand why we are not considering or why the board is not considering the August of 2005, which was two months after the separation, which seemed... Which to me would be the closest in time. Definitely closer than the June of 2004 and July of 2005. Yes. And the issue there, which the board made clear, is that it found that the range of motion measurement taken during that C&P exam was not useful for rating purposes under the vastity because she wore a rigid back brace during the examination. And that rigid back brace was designed to restrict range of motion. So that back brace interfered with the ability to assess range of motion. And that's why it was not... And that's why the board consensus was that that range of motion measurement was not useful for rating under Vassargate. So they considered the record where there is no range of motion rating? They considered the information. And what their conclusion was is that that measurement wasn't useful because she was wearing a back brace, which is designed to restrict range of motion. So it interfered with that ability to actually assess what her true range of motion was. I guess what I'm getting at. So we consider... So the board considered the February report where there is no range of motion taken, but did not consider the August report where you have some range of motion. February, there's nothing done. Correct. But they found information that was still useful in that February exam. It was useful and supported their conclusion of full range of motion. The problem with August of 05 is that back brace. And you have a range of motion measurement that was effectively impeded by that rigid back brace, which is designed to restrict range of motion. But I believe the report, and I'm not going to try to quote it, but it talks about the pain secondary. Is she still having the pain secondary to having the back brace on? Right? She still had pain with the back brace, yes. But what my point is, and what the consensus of the board was, is you can't tell what her true range of motion was because of that rigid back brace. It interfered with the ability to measure the range of motion because it was designed to restrict range of motion. But in conclusion, the PDBR correctly considered the June 2004, July 2004, and February exams out of time. Okay. Thank you, counsel. Any other questions, Judge Rushing or Judge Benjamin? No other questions. We appreciate it. Thank you. And we'll hear from the appellant in rebuttal. Thank you, Your Honor. I have four points that I want to make. First, I want to address the point we discussed at the end of my opening about the inadequacy of the exams. Congress of the board must follow the Vassar D and section 4.2 requires that exams lacking sufficient detail be deemed inadequate for evaluation purposes. That means where, as here, the Vassar D ties the rating evaluation to range of motion and functional loss due to pain, an exam that lacks such details is inadequate. DeLuca makes that clear, and so does Correa when it says that those that emit a range of motion measurements entirely need to be set aside. Mitchell makes a point as well, says that the examiner, not the board, must either A, measure and report the degree where pain begins and ends during range of motion testing, or B, state that providing that estimate is not feasible and explain why. Mitchell also makes clear that recording range of motion and generally noting pain during that motion is not enough to have a sufficient exam, as was the case there. You need to express the measurement in degrees. And note, this is not just a hollow formality. Returning the exam as inadequate helps to ensure the board has a meaningful record and doesn't try to compare apples to oranges by looking at criteria other than what the Vassar D requires the board to consider. That brings me to the second point about the muscle strength testing in the February 2005 exam discussed by my friend from the other side. Muscle strength does not speak to Ms. Thompson's range of motion. Those are two separate inquiries, and the Vassar D again ties the veteran's disability rating to the latter, to her range of motion. That's an objective measurement. So while we don't see anything in the opinion that looks to which doctor made the measurement, as Judge Rushing alluded to, there's nothing to cast doubt on the objective measurements from the December exam, and the board offered none. There's also nothing in the record, much less the PDBR's decision, that suggests that strength finding can be used to estimate range of motion. On the contrary, the record shows that Ms. Thompson's muscle strength was good, even when her range of motion was not. The August 2005 exam by the VA also said, quote, good strength at JA 117. So did the October 2003 exam at JA 197, which rated her, quote, five out of five strength, and so did the March 2008 exam at JA 130, which again recounted, quote, five out of five strength, even though her range of motion was less than 10 degrees. Third point I want to make is about my friend's argument that this is about reweighing the evidence. It's not. The board here committed several legal errors, and I'll give you at least five. First, the board utterly failed to grapple with the highly probative December 2004 exam, which was closer in time to separation than the June or July exams, rendering this decision arbitrary and capricious. My friend said the board's rationale must be able to be reasonably discerned, and there's just no way to discern that. Second, the board violated section 4.10 by throwing away the August 2005 exam based on an ordinary condition of daily life. Third, the board flouted DOD instruction 6040.44 and the whole point of the Dignified Treatment of Wounded Warriors Act by failing to give particular consideration to the August 2005 exam, which led the VA to issue a 40 percent rating based on the exact same VASA-D criteria that the board had to apply. Fourth error is that the board relied instead on the legally inadequate February 2005 exam that failed to record range of motion in violation of sections 4.2, 4.45, 4.59, DeLuca, and Correa. The fifth error was that it also relied on the inadequate June and July exams that failed to record functional loss for the degree at which Ms. Thompson exhibited pain in violation of sections 4.2, 4.40, DeLuca, and Mitchell. Those are all legal errors that require reversal and that this review is de novo. Finally, I think it's important for the court to remember that Congress created the PDBR precisely for disabled veterans like Ms. Thompson who were shortchanged by the military's chronically low ratings. Congress knew that military retirement status makes a huge difference and has serious real-world consequences for these veterans. To that end, it told the board to strictly follow the VASA-D like the VA has all these years. The board failed to do that here in multiple ways, and in doing so, it perpetuated the very error that it was supposed to correct. The severe disability that Ms. Thompson suffered while serving our country entitles her to military retirement, and if there are no further questions from the court, we respectfully ask that the court reverse. Thank you, Counsel Judge Rushing. Judge Benjamin, do y'all have any other questions of the appellant? Okay, thank y'all. We really appreciate both your arguments there. This is an important case and we normally would be, if we were in Richmond, walking down right now to see y'all and shake hands and thank you for your assistance. We can't do that, but please know that we appreciate your help very much and appreciate your arguments in your briefs. Thank you and we'll move on to the next case.
judges: A. Marvin Quattlebaum Jr., Allison J. Rushing, DeAndrea Gist Benjamin